IN THE COURT OF APPEALS
AT KNOXVILLE

FILED

July 31, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

RENAISSANCE FINANCIAL          )     KNOX CHANCERY
SERVICES, INC.,                )     C.A. NO. 03A01-9710-CH-00462
                               )
        Plaintiff-Appellee     )
                               )
vs.                            )
                               )     HON. FREDERICK D. McDONALD
                               )     CHANCELLOR
                               )
RONALD K. BILLBURY and         )
DIANA D. BILLBURY,             )
                               )
        Defendants-Appellants  )     AFFIRMED AND REMANDED


DUDLEY W. TAYLOR, The Taylor Law Firm, Knoxville, for Appellants.


HENRY T. OGLE, Knoxville, for Appellee.



O P I N I O N

McMurray, J.


    Plaintiff Renaissance Financial Services, Inc., brought this action against Ronald and Diana Billbury to recover a contractual fee for services allegedly rendered in procuring a bank loan commitment, intended to finance the Billburys' purchase of a marina.  The Billburys argued that they were not responsible for the fee because the president of Renaissance, Clifford C. Renfro, Jr., breached his fiduciary duty to them by not diligently seeking

the financing package outlined in the parties' contract. The trial court found that under the clear and unambiguous terms of the contract, payment of the "mortgage banking fee" was due to Renaissance, and held the Billburys responsible for the fee. The Billburys have appealed from this judgment. We affirm the judgment of the trial court.

In 1995, the Billburys became interested in purchasing a marina in East Tennessee. On July 13, 1995, they signed a commercial purchase agreement with Jacques Vincent whereby they agreed to purchase from Vincent a property called "P.J.'s Marina" for $2,130,000. At that time, Vincent had agreed to provide seller financing for all but $600,000 of the purchase price. The Billburys had $300,000 in personal funds available, and in August of 1995, they approached Renaissance in an attempt to obtain additional financing in the amount of $300,000.

The Billburys dealt exclusively with Renfro over the course of their involvement with Renaissance. Renfro told them that he did not consider a commercial bank loan of $300,000 feasible, because in his opinion no bank would consider making a loan for such an amount behind a large, seller-financed first mortgage. Renfro testified that the parties then discussed possible alternatives, and he suggested that the parties seek a more conventional financing package. Renfro suggested that he, on the Billburys' behalf, try to obtain financing for the purchase in the following

2

package: a first mortgage from a commercial lender in the amount of $750,000; a second mortgage from the Small Business Administration (SBA) in the amount of $750,000; and seller financing for the remaining $350,000.[1] Based on his review of financial statements which had been provided by Vincent at that time, Renfro concluded that the marina's cash flow would make such a financing package feasible.

The parties signed a "Financial Services Agreement" on September 3, 1995, which incorporated the terms of the proposed financial package described above, and further stated in relevant part:

> The undersigned (hereinafter called "Applicant") hereby engages Renaissance Financial Services, Inc. (hereinafter called "RFS") to procure on its behalf a loan commitment or commitments from any bank, savings and loan, savings bank, or any other institution which makes commercial loans. Said loan commitment(s) shall be according to the terms and conditions and with the security hereinafter set forth. The undersigned hereby agrees that this application represents only the agreed upon business framework upon which the final terms and conditions, including all legal and business requirements to be included in the loan documents, shall be built. The approval and funding of any loan(s) procured hereby is specifically subject to satisfaction of all terms, covenants, and conditions contained in the commitment letter(s) issued thereby and duly executed by Applicant.

> *     *     *     *

> **RFS Packaging Fee:** Applicant hereby agrees to pay RFS a loan packaging fee of $4,000 for its professional services and expenses in analyzing, underwriting, and packaging this loan request. Upon execution of this

---

[1]The finance package, including the Billburys' $300,000 contribution, thus totaled $2,150,000. The additional $20,000 above the purchase price was to cover closing expenses.

3

Agreement $2,000 of this fee is due as an advanced retainer. The balance of the loan packaging fee is payable upon obtaining approval of the bank loan.

**RFS Mortgage Banking Fee:** Upon acceptance of any bank loan commitment(s) for financing procured hereby (and final approval of any conditional SBA loan approvals, if any), Applicant agrees to pay to RFS a loan origination fee for arranging said financing. Further, should RFS obtain and present to you (a) commitment letter(s) with terms and conditions other than those outlined herein which is acceptable to and accepted by you, it is hereby mutually agreed that RFS shall have earned said fee for negotiating acceptable loans on your behalf. Said fee is deemed earned upon issuance and acceptance of said commitment(s). Applicant hereby agrees to pay said fee in the amount of $13,500.

During their initial discussion, Renfro advised the Billburys that he would need tax returns or accountant-prepared financial statements from the P.J.'s marina business in order to prepare a loan request package. After the Billburys received these financial documents and promptly forwarded them to Renfro, it became apparent that the initial financial statements provided by Vincent were not accurate. Renfro testified that the actual accountant-prepared financial statements reflected a cash flow of about one-half what was shown on Vincent's initially provided statements.

Renfro testified that after he reviewed the accurate financial statements, "I knew immediately [they] would not support the loan contemplated in the Financial Services Agreement of $1.5 million by an institutional lender." The parties then met in November 1995 to discuss further options. Renfro told the Billburys the actual cash flow of the business would not support the transaction as proposed, and that they would need to restructure the loan proposal

4

to try to obtain institutional financing in the amount of one million dollars.  He also testified that he advised the Billburys that they might want to reconsider or renegotiate the sales price, but after they conferred with Vincent and the real estate agent, they stated that they remained satisfied with the price.  Mr. Billbury testified that Renfro never suggested they renegotiate the sales price with Vincent.

As a result of the November meeting, the Billburys and Vincent executed an "addendum to real estate sales contract" which stated in relevant part as follows:

> Financing terms referred to in Item 1, Page 1, of the above contract shall be set forth as follows:
>
> First Loan:
>
> 1) Proceeds from new first loan of $1,000,000 for a term of fifteen to twenty years shall be secured from a commercial lending institution at a fixed rate of interest.  Part of this loan may come from the Small Business Administration.
>
> Seller Financing:
>
> 2) Proceeds from a new second loan shall be secured from seller in the amount of $875,00 for fifteen years at a fixed interest rate of 7.5% ... .

Subsequently, Renfro submitted a loan request package on behalf of the Billburys to several financial institutions, requesting a loan in the amount of $500,000.  Two of the banks responded with loan approvals for $500,000 first mortgages, subject to an SBA second mortgage loan of $500,000.

5

In January 1996, Renfro submitted a $500,000 loan request package to the SBA, which was subsequently rejected. Renfro then obtained approval from one of the banks to increase its loan and first mortgage to $750,000. Vincent agreed to finance the remainder of the purchase price, less the $300,000 provided by the Billburys. The bank sent the Billburys a loan commitment letter agreeing to loan them $750,000, which the Billburys signed. The Billburys testified that they tried on numerous occasions to reach and consult Renfro regarding the loan commitment letter, but could not reach him, so they signed the letter without his consultation.

Subsequently, negotiations between the parties broke down when it was discovered for the first time that Vincent, for tax reasons, would only agree to a stock sale of the marina. The Billburys insisted on an asset sale. The parties could not agree on this point, and the sale was never consummated. Vincent's attorney testified that the reason the deal failed was not because of a lack of financing, but because the parties could not agree on the other terms of the sale.

Some time after the deal fell apart, Renfro sent the Billburys an invoice for Renaissance's $13,500 loan origination fee. The Billburys refused to pay the fee, and this litigation ensued. As noted above, the trial court found that the Billburys were contractually liable for the fee. The sole issue on this appeal is whether the court was correct in making that determination.

6

We first note that the clear and unambiguous terms of the agreement between Renaissance and the Billburys support Renaissance's assertion that the fee is due and payable in full. The agreement provides:

> Upon acceptance of <u>any</u> bank loan commitment(s) for financing procured hereby (and final approval of any conditional SBA loan approvals, if any), Applicant agrees to pay to RFS a loan origination fee for arranging said financing. Further, <u>should [Renaissance] obtain and present to you (a) commitment letter(s) with terms and conditions other than those outlined herein which is acceptable to and accepted by you, it is hereby mutually agreed that [Renaissance] shall have earned said fee for negotiating acceptable loans on your behalf. Said fee is deemed earned upon issuance and acceptance of said commitment(s)</u>. Applicant hereby agrees to pay said fee in the amount of $13,500. [emphasis added].

It is uncontroverted that Renaissance, through Renfro, procured a loan commitment letter from a bank in the amount of $750,000. The Billburys both signed and accepted the commitment letter.

Mrs. Billbury testified that she did not read the financial services agreement with Renaissance before she signed it, but instead relied on Renfro's explanation of the agreement. Mr. Billbury testified that Renfro did not read the back side of the agreement to them, where the "mortgage banking fee" terms were located and where the parties signed at the bottom. Mr. Billbury stated that he certainly would not have signed the loan commitment letter if he had thought that act would trigger liability for

7

Renaissance's fee.  That result, however, is mandated by the clear, unambiguous terms of the contract.

The following long-established and fundamental principles of contract law, recently enunciated by this court in <u>Gates, Duncan & Vancamp Co. v. Levatino</u>, 962 S.W.2d 21 (Tenn. App. 1997), are equally applicable to the present case:

> It has long been established in this state that a contract must be interpreted and enforced according to its clear, plain and unambiguous terms.  <u>Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.</u>, 521 S.W.2d 578, 580 (Tenn. 1975).  When the language of the contract is unambiguous and there is no claim of fraud or mistake, the court must give effect to the intention of the parties as expressed in the language used in the contract.  <u>Jennings v. Hayes</u>, 787 S.W.2d 1, 2 (Tenn.App. 1990).
>
> Moreover, the parties to a contract cannot create an ambiguity where none exists.  <u>Edwards v. Travelers Indemnity Co.</u>, 201 Tenn. 435, 300 S.W.2d 615, 617-18 (1957).  Parole evidence is inadmissible to contradict or vary the terms of a written contract, when the parties' intentions are readily ascertained from the contract as reduced in writing.  <u>McQuiddy Printing Co. v. Hirsig</u>, 23 Tenn.App. 434, 134 S.W.2d 197, 204 (1939).  The law conclusively presumes that the parties to a contract understood its obligations, and evidence is not admissible to show that their understanding was in fact otherwise.  <u>Id</u>. 134 S.W.2d at 204.

<u>Id</u>. at 25.

The Billburys have not raised fraud, mistake or any set of equitable circumstances which might constitute an exception to the parole evidence rule.  We concur with the trial court that the evidence does not show a breach of a fiduciary duty by either

8

Renaissance or Renfro. Consequently, we are constrained to enforce the clear terms of the contract between Renaissance and the Billburys, which provide that Renaissance has earned its fee by procuring a loan commitment letter, acceptable to and accepted by the Billburys.

The judgment of the trial court is affirmed in its entirety. Costs on appeal are assessed to the appellants.

_____
Don T. McMurray, Judge

CONCUR:

_____
Houston M. Goddard, Presiding Judge

_____
Charles D. Susano, Jr., Judge

9

IN THE COURT OF APPEALS
AT KNOXVILLE



| | | |
|---|---|---|
| RENAISSANCE FINANCIAL SERVICES, INC., | ) ) ) | KNOX CHANCERY C.A. NO. 03A01-9710-CH-00462 |
| Plaintiff-Appellee | ) ) | |
| vs. | ) ) ) ) | HON. FREDERICK D. McDONALD CHANCELLOR |
| RONALD K. BILLBURY and DIANA D. BILLBURY, | ) ) ) | |
| Defendants-Appellants | ) | AFFIRMED AND REMANDED |


**JUDGMENT**


This appeal came on to be heard upon the record from the Chancery Court of Knox County, briefs and argument of counsel. Upon consideration thereof, this Court is of opinion that there was no reversible error in the trial court.

The judgment of the trial court is affirmed in its entirety. Costs on appeal are assessed to the appellants.


PER CURIAM